(No. 56106.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DALE M. CARTER, Appellee.

*Opinion filed December 17, 1982.—Rehearing denied September 30, 1983.*

Tyrone C. Fahner, Attorney General, of Springfield (Donald Townsend and Greig R. Siedor, Assistant Attorneys General, of counsel), for the People.

Donald Page Moore and Jo-Anne F. Wolfson, of Chicago, for appellee.

Joseph C. Long, of Norman, Oklahoma, for *amicus curiae* North American Securities Administrators, Inc.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Dale M. Carter, was convicted of violations of the Franchise Disclosure Act (hereafter the Act) (Ill. Rev. Stat. 1977, ch. 121½, par. 701 *et seq.*) and sentenced to three years in the custody of the Department of Corrections. Defendant appealed and the appellate court, holding that section 12 of the Act was unconstitutional (Ill. Rev. Stat. 1977, ch. 121½, par. 712), reversed the judgment. (102 Ill. App. 3d 796.) We allowed the People's petition for leave to appeal as a matter of right. 73 Ill. 2d R. 317.

The facts are adequately stated in the opinion of the appellate court. In a four-count indictment it was charged that defendant, chairman of the board of Pie Tree, Inc., violated various provisions of the Act in the sale of a franchise to Roger Collier. Count I charged the sale of an un-

registered franchise, a violation of sections 4(1) and 16 of the Act; count II charged failure to provide Collier with a disclosure document as required by section 4(2) of the Act; count III charged failure to place into escrow the moneys received in the sale, in violation of section 6 of the Act; and count IV charged the failure to register all franchise sale persons, in violation of section 16.1 of the Act.

In pertinent part section 12 provided:

"The [Attorney General] may by rule or order, and subject to such terms and conditions as he may prescribe, exempt any franchise, franchisor, subfranchisor, franchise broker, or salesperson from Sections 4, 16 *** of this Act if he finds that the enforcement of this Act is not necessary in the public interest ***." (Ill. Rev. Stat. 1977, ch. 121½, par. 712.)

The appellate court concluded:

"[T]he phrase 'in the public interest' is not an intelligible limitation on the exemption power in the context of an F.D.A. criminal prosecution. Consequently, when considered in conjunction with section 20, section 12 of the F.D.A. is an unconstitutional delegation of legislative power." 102 Ill. App. 3d 796, 800.

The People contend that the defendant was without standing to attack the validity of the Act. Although this contention is not entirely without merit, we have elected to consider the constitutional question presented. Defendant contends that "in the public interest" is "not an intelligible standard" and that the statute creates an invalid delegation of legislative authority. We do not agree.

This court has enunciated the criteria relevant to examining the validity of a legislative delegation of power to an administrative agency. In *Hill v. Relyea* (1966), 34 Ill. 2d 552, 555, this court stated:

"Absolute criteria whereby every detail necessary in the enforcement of a law is anticipated need not be established by the General Assembly. The constitution merely requires that intelligible standards be set to guide the

agency charged with enforcement [citations], and the precision of the permissible standard must necessarily vary according to the nature of the ultimate objective and the problems involved. [Citations.]"

See also *Polich v. Chicago School Finance Authority* (1980), 79 Ill. 2d 188, 206; *Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 300.

We are of the opinion that "in the public interest" is not an improper standard for delegation. In *International Ry. Co. v. Public Service Com.* (1942), 264 A.D. 506, 36 N.Y.S.2d 125, the Appellate Division of the Supreme Court of New York persuasively refuted defendant's argument:

"It must be conceded that a criterion of 'public interest,' standing alone, presents a standard of immense and varied implications. And if it can only be interpreted as setting up a standard so embracive and indefinite as to confer unlimited power, then, of course, it runs counter to the rule against the complete delegation of legislative power. [Citation.] But in our opinion it need not be and should not be so interpreted. Rather, it should be construed with reference to the general purposes and the subject matter of the [law in question], and if it may be logically found that the criterion of 'public interest' is directly related and limited to the general purposes of such law then it is a sufficient guide. [Citations.]" (264 A.D. 506, 510, 36 N.Y.S.2d 125, 131, *aff'd* (1943), 289 N.Y. 830, 47 N.E.2d 435.)

In *American Power & Light Co. v. Securities & Exchange Com.* (1946), 329 U.S. 90, 104, 91 L. Ed. 103, 115, 67 S. Ct. 133, 142, the Supreme Court noted that delegation standards should not be tested in isolation because "They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear." In *Northern Illinois Auto Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 61, this court recognized that in order to determine whether a rule promulgated by the Secretary of State was consistent with the "public interest" depended upon the purposes of

the pertinent statute.

With respect to the act involved here, the legislative findings and statement of purposes contained in the Act (see Ill. Rev. Stat. 1977, ch. 121½, par. 702) make it clear that the purposes of the Act are to protect the investments of people buying franchises and to insure that before entering into a franchise agreement they are fully informed of the franchisor's financial condition. Section 5 of the Act sets forth the information that must be contained in the disclosure statement which under section 4 of the Act must be provided a purchaser and under section 16 must be filed with the Attorney General. Franchisors whose shares are registered with Securities Commissions and listed on Securities Exchanges are required to furnish statements containing at least as much information as is required under section 5. Where the information is thus readily available through other sources, the Attorney General might find that enforcement of the Act is not necessary. When considered in light of the purposes of the Act the standard "in the public interest" is an intelligible standard which survives constitutional scrutiny.

The delegation here is certainly no broader or more unintelligible than the delegation in *Hill v. Relyea* (1966), 34 Ill. 2d 552. In *Hill*, the statute gave the superintendent of the hospital in which a mentally retarded person was being treated the power and authority to discharge patients "as the welfare of such person and the community may require." (34 Ill. 2d 552, 555.) This court noted that the superintendent of the hospital and his staff were in a much more advantageous position to determine when the welfare of the person and of the community required a discharge of a hospitalized mentally retarded person and that "The nature of the objectives to be achieved and the problems to be solved negate the usefulness of setting more precise legislative standards." (34 Ill. 2d 552, 556.) Here the expertise and the availability of the information necessary to deter-

mine when prospective franchisees do not require the protection of escrowed moneys and financial disclosure statements place the Attorney General in a position to determine when "the enforcement of this Act is not necessary in the public interest" (Ill. Rev. Stat. 1977, ch. 121½, par. 712) and negate the desirability of more precise standards.

Defendant contends that the statute, in violation of the equal protection and due process clauses of the United States and Illinois constitutions, grants the Attorney General "unrestricted future exemption power." He contends further that delegation to the Attorney General of such unrestricted criminal-exemption power violates the separation of powers clause found in section 1 of article II of the 1970 Constitution. The rules promulgated by the Attorney General pursuant to section 27 of the Franchise Disclosure Act (Ill. Rev. Stat. 1977, ch. 121½, par. 727) and in accordance with the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1977, ch. 127, par. 1001 *et seq.*) provide the procedure for securing an order of exemption. The Illinois Administrative Procedure Act (Ill. Rev. Stat. 1977, ch. 127, par. 1001 *et seq.*) provided:

> "No action by any agency to adopt, amend or repeal a rule after this Act has become applicable to the agency shall be valid unless taken in compliance with this Section." (Ill. Rev. Stat. 1977, ch. 127, par. 1005(c).)

Section 5(a)(1) of the Illinois Administrative Procedure Act provided for the giving of notice to the general public, at least 45 days in advance of a rule's effective date, as to the text of the rule, the statutory authority giving the agency the power to promulgate the rule, and other pertinent information. (Ill. Rev. Stat. 1977, ch. 127, par. 1005(a)(1).) Section 29 of the Franchise Disclosure Act (Ill. Rev. Stat. 1977, ch. 121½, par. 729) provided that all final administrative decisions of the administrator are reviewable under the Administrative Review Act. With these safeguards it is

difficult to conclude that the Attorney General is vested with either "unrestricted criminal exemption power" or that the statute, as applied, fails to provide either equal protection or due process. Defendant's contention that the "delegation to the Attorney General of an unrestricted criminal exemption power violates the separation of powers" rests on the erroneous premise that the power is arbitrary and unrestricted. Clearly, the power, as delegated, does not violate the separation of powers.

Defendant contends that the indictment is insufficient in that it fails to charge a criminal offense. Insofar as his challenge is directed to counts I, II and IV it falls with our holding that sections 12 and 20 of the Act are not invalid. The challenge to count III presents a different question.

Count III charges that defendant engaged "in an act, practice or course of business which operated as a fraud and deceipt [sic] upon Roger Collier, in violation of Illinois Revised Stats., 1977, as amended Chapter 121½ par. 706. to wit: failing to place the franchise fee paid by Roger Collier in an escrow account as required by the Illinois Attorney General's Office." It is defendant's contention that count III "charges an offense never created by the legislature." He argues that no statute makes it a crime to fail to do anything "as required by the Illinois Attorney General's Office."

Section 11 of the Franchise Disclosure Act (Ill. Rev. Stat. 1977, ch. 121½, par. 711) provides that if the Attorney General finds that a franchisor has failed to demonstrate that adequate financial arrangements have been made to fulfill his obligations he may, by rule or order, require the escrow of franchise fees until the obligations have been fulfilled. Section 11 also provides that at the option of the franchisor a surety bond may be furnished in lieu of the escrow.

In our opinion count III is adequate to charge a violation of section 6, alleging that the device to defraud was

the failure to place the franchise fee in an escrow account. Section 6(1)(a) of the Act (Ill. Rev. Stat. 1977, ch. 121½, par. 706(1)(a)) provides that it is unlawful to employ any device, scheme or artifice to defraud, and the offense alleged is a violation of section 6(1)(a) based on a requirement contained in section 11. Furthermore, it was clearly adequate to enable the defendant to be fully advised of the nature of the charge and to prepare his defense. (See *People v. Pujoue* (1975), 61 Ill. 2d 335, 339; *People v. Walker* (1980), 83 Ill. 2d 306, 313-14.) Any additional information which he might have required could have been obtained by filing a motion for a bill of particulars. We hold that counts I, II, III, and IV of the indictment do not fail to meet the requirements of either the Federal or Illinois constitutions.

Defendant contends that the evidence fails to prove him guilty beyond a reasonable doubt. He argues that there is no showing that the attorney, to whom the Attorney General directed the letter concerning the escrow of funds, received the letter, or that its contents were in any manner communicated to the defendant.

The record shows that all communications with defendant of the Attorney General, as administrator under the Act, were through the attorney, Mr. Beatty. There was no requirement that the Attorney General advise the defendant of the statutory provision or of the rules promulgated under the authority of the statute. The testimony shows that the letter was sent to Mr. Beatty, to whom all correspondence with Pie Tree was to be directed. That fact, when considered with other correspondence in evidence, was sufficient proof that the information concerning the need for the escrow was conveyed to defendant.

As previously noted, the rules provided the method for obtaining an exemption and for administrative review in the event of a denial of an application for such exemption. There is no evidence of any attempt to comply with the statute or in any manner pursue the procedures which

would have exempted the defendant from such compliance. We hold that the evidence is sufficient to prove the defendant guilty of the offense charged beyond a reasonable doubt.

Defendant contends that the circuit court erred in the giving of the issues instruction. The record shows that in the conference no question was raised concerning the instruction and that it was given without objection. "[T]he waiver rule does not apply to *substantial defects* in instructions *if the interests of justice require."* (*People v. Roberts* (1979), 75 Ill. 2d 1, 11.) From our examination of the instructions we conclude that there were no substantial defects and the record presents no plain error and no reason for the application of our rule concerning waiver.

Finally defendant contends that his sentence is excessive. He states that shortly after he was sentenced in this case he was sentenced to a five-year term in Georgia which was to be served concurrently with the sentence imposed in this case. He argues that because he had not as yet been sentenced in Georgia there was no way in which the Illinois sentence could be made concurrent with that in Georgia, and that he will be required to serve a total of eight years on the two commitments. Under the circumstances existing at the time the sentence was imposed it is apparent that there was no basis on which the circuit court could have considered making the sentence concurrent with that in Georgia. There is, however, no impediment to the defendant's applying to the circuit court for a reduction of sentence in accordance with section 5—8—1(f) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(f)).

For the reasons herein stated, the judgment of the appellate court is reversed and the judgment of the circuit court of Cook County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE MORAN, concurring in part and dissenting in part:

I concur in the judgment as to counts I, II and IV but dissent from the results reached as to count III. In my opinion the specific section of the statute under which the defendant was charged in this count is invalid due to vagueness.

The indictment charged defendant with a fraudulent practice in that he wilfully sold a franchise by engaging in an act, practice or course of business which operated as a fraud and deceit, to-wit: failing to place the franchise fee paid by the complainant in an escrow account as required by the Illinois Attorney General's office.

The Franchise Disclosure Act (Act) provides for both civil and criminal sanctions for violation of its provisions. Section 6(1)(c), under which the defendant was indicted in count III, states:

> "Fraudulent practices.
>
> (1) It is unlawful for any person, in connection with the offer or sale of any franchise, to directly or indirectly:
>
>         * * *
>
> (c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." (Ill. Rev. Stat. 1977, ch. 121½, par. 706(c).)

Anyone found guilty of violating this section commits a Class 4 felony and is subject to imprisonment for a term of one to three years.

The use of the words "fraud or deceit" under section 6(1)(c) would, ordinarily, create no problem since they have a well-settled meaning in the common law. But the Act goes further. Section 3(11) states that the words " 'Fraud' and 'deceit' are not limited to common law fraud or deceit." (Ill. Rev. Stat. 1977, ch. 121½, par. 703(11).) Since the words are not limited to their common law meaning,

then what are the elements of this new, open-ended crime of "fraud and deceit"? I suggest there are none. Without knowing the elements of a crime, how will a person be able to conform his conduct so as to be within the law?

Over 50 years ago, the United States Supreme Court expressed, better than I, why a penal statute must be explicit, when it stated:

> "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Construction Co.* (1926), 269 U.S. 385, 391, 70 L. Ed. 322, 328, 46 S. Ct. 126, 127.

For the reasons stated, I would affirm that part of the appellate court judgment reversing the conviction based on count III of the indictment.

JUSTICE SIMON, dissenting:

The majority upholds section 12 of the Franchise Disclosure Act (Ill. Rev. Stat. 1977, ch. 121½, par. 712), which grants the Illinois Attorney General the power to exempt individuals from criminal penalties provided in the Act. The Attorney General's power to grant exemptions is limited only by the highly indefinite requirement that the exemption be "in the public interest."

This precedent could undermine civil liberties in a time of crisis. The legislation grants the Attorney General the power to create a privileged class that is exempt from the criminal law which the rest of society must obey. At the same time the legislation fails to establish articulable standards for the Attorney General to use in making such a mo-

mentous decision.

In reaching its decision the majority principally relies upon precedent arising from civil cases. Given the criminal context of this case, is this reliance not misplaced? I would hold that the public-interest exemption is unconstitutional, violating both equal protection (Ill. Const. 1970, art. I, sec. 2; U.S. Const., amend. XIV, sec. 1) and the nondelegation doctrine (Ill. Const. 1970, art. II, sec. 1, art. IV, sec. 1).

I

Equal protection of the laws: The majority asserts that other courts have approved of the "public interest" standard in many civil contexts and that this court has traditionally applied an extremely deferential scrutiny to legislative classifications in economic-regulatory statutes. In the cases cited by the majority, however, criminal liability never directly hinged upon the "public interest" classification, while in the present case the "public interest" standard determines who is subject to criminal liability and who is exempt.

Because of the criminal context, it is inappropriate to apply in this case the extremely deferential standard of review that this court has used in evaluating the constitutionality of legislative classifications in the field of economic regulation. When a statute grants an executive officer the power to exempt certain persons from *criminal* liability, equal protection should require that the legislature clearly and definitely specify under what circumstances the exemption is to apply. Otherwise there is always a danger that the exemption is designed for an illegitimate purpose. Justice Jackson recognized the dangers of arbitrary exemptions from general legislative schemes when he observed:

"[I]t [is] a salutary doctrine that cities, states and the Federal Government must exercise their powers so as not to discriminate between their inhabitants except upon some reasonable differentiation fairly related to the ob-

ject of regulation. This equality is not merely abstract justice. The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation." *Railway Express Agency, Inc. v. New York* (1949), 336 U.S. 106, 112-13, 93 L. Ed. 533, 540, 69 S. Ct. 463, 466-67 (Jackson, J., concurring).

To survive analysis under the equal protection clause a statute must have a *legitimate* purpose. For example, "a bare congressional desire to harm a politically unpopular group" is not a *legitimate* governmental interest. *United States Department of Agriculture v. Moreno* (1973), 413 U.S. 528, 534, 37 L. Ed. 2d 782, 788, 93 S. Ct. 2821, 2826.

The majority observes that the purpose of the exemption is evident in the statement of the legislature's purpose in enacting the Franchise Disclosure Act. But the majority is simply mistaken when it claims that the only purpose of the legislature was to ensure that franchisees receive information about the *financial* health of the franchisor before they purchase a franchise. Section 2 of the Act clearly sets forth the purpose of the disclosure requirements:

"(1) The General Assembly finds and declares that the widespread sale of franchises is a relatively new business phenomenon which has created numerous problems in Illinois. Illinois residents have suffered substantial losses where the franchisor or his representative has not provided full and complete information regarding the *franchisor-franchisee relationship, the details of the contract between the franchisor and franchisee,* the prior business experience of the franchisor and other factors relevant to

the franchise offered for sale.

(2) It is the intent of this Act: (a) to provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered for sale; and (b) *to protect the franchisee and the franchisor by providing a better understanding of the business and the legal relationship between the franchisor and the franchisee.*" (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 121½, par. 702.)

As the emphasized language indicates, the aim of the Act is to ensure that Illinois franchisees have maximum access to information not only about the financial health of the franchisor, but the terms and conditions of the franchise contract as well. (See also Ill. Rev. Stat. 1977, ch. 121½, pars. 705(18) through 705(21) (disclosure statement must contain information about whether franchise must be owner operated; whether franchise contract contains territorial protection clause or covenant not to compete; and whether and upon what conditions the franchisor may terminate the franchise).) This policy is as applicable to franchisors who have already disclosed *financial* information to the Securities and Exchange Commission and other public agencies as it is to all other franchisors; it is anomalous to view this language as providing support for an exemption from the disclosure requirements created by the Act.

The legislature's purpose in creating the "public interest" exemption does not appear in either the statute or in the legislative history of the statute. In such circumstances I believe that the legislative classification must bear a fair and substantial relationship to the purposes that the People's counsel in a litigated proceeding attribute to the legislature. *Cf. Schweiker v. Wilson* (1981), 450 U.S. 221, 244-45, 67 L. Ed. 2d 186, 204-05, 101 S. Ct. 1074, 1088 (Powell, Brennan, Marshall and Stevens, JJ., dissenting).

The People assert and the majority agrees that the purpose of the "public interest" exemption is to exempt franchisors from the disclosure requirements when the *finan-*

*cial* information that they must disclose under the statute is available from other sources. If this were the real purpose of the exemption, the legislature could easily have stated it in specific language. As stated, the "public interest" standard is too vague to guarantee that is how it will be applied. The "public interest" standard is more of a slogan than an articulable and reviewable standard. This vague standard would sustain an exemption for many franchisors even though information about their financial condition is not available from any other sources. The same vague standard could also be used to deny the exemption to some franchisors even though such information is readily available. The imprecision of the "public interest" standard is too obvious to withstand equal protection scrutiny in this criminal proceeding. Because the exemption power granted to the Attorney General is unconstitutional, the criminal sanctions imposed in this case are void.

II

The "public interest" exemption provided in section 12 also violates the nondelegation doctrine. This court has often recognized "the guiding principle that intelligible standards or guidelines must accompany legislative delegations of power." (*Thygesen v. Callahan* (1979), 74 Ill. 2d 404, 408.) This principle arises both from the separation of powers doctrine (Ill. Const. 1970, art. II, sec. 1, art. IV, sec. 1) and from the recognition that the delegation of pervasive legislative powers to the executive can ultimately endanger civil liberties.

In *Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, this court established a three-part test for reviewing legislative delegations of power to the executive. In order to be valid the legislature must sufficiently identify:

"(1) The *persons* and *activities* potentially subject to regulation;

(2) the *harm* sought to be prevented; and

(3) the general *means* intended to be available to the administrator to prevent the identified harm." 68 Ill. 2d 361, 372.

The exemption provided for by section 12 of the Franchise Disclosure Act fails to comply with these requirements. Neither section 12 nor any other provision of the Act identifies what *persons* are to receive the exemption or what *harm* the legislature sought to avoid by providing this exemption from the statute's criminal penalties. The "public interest" criteria established in section 12 provides only a vague and inappropriate guide to the Attorney General for evaluating a franchisor's application for the exemption.

In *Thygesen v. Callahan* (1979), 74 Ill. 2d 404, this court declared unconstitutional a statute that authorized the Director of Financial Institutions to establish a maximum fee schedule for community currency exchanges. The only limitation on the Director's power to establish the rates was that they be "reasonable" and "relevant." (Ill. Rev. Stat. 1977, ch. 16½, par. 49.) The court declared that such " 'uncabined discretion' " is unconstitutional, especially where the legislature also failed to communicate to the Director the harm that it intended to prevent in mandating a maximum fee schedule. 74 Ill. 2d 404, 411, quoting *Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, 373.

The "public interest" standard involved in this case is no more specific than the "reasonable" and "relevant" standard involved in *Thygesen.* Moreover, the *harm* to be alleviated by the exemption is no more precisely identified here than it was in *Thygesen.* Contrary to the majority's assertion, the purpose the legislature had in providing the exemption in section 12 is not evident from the statement of the legislature's purpose in enacting the Franchise Disclosure Act. As noted above, the statute clearly indicates that it aims to provide Illinois franchisees with easy access

to information about both the financial health of the franchisor *and* the terms and conditions of the franchise contract. (See, *e.g.*, Ill. Rev. Stat. 1977, ch. 121½, pars. 702, 705(18) through 705(21).) This policy is as relevant to franchisors with their shares listed on a national stock exchange as it is to the smaller, less well-capitalized franchisors, and it does not provide any meaningful guidance to the Attorney General on how to use the power to grant exemptions from the disclosure requirements "in the public interest."

The "public interest" exemption provided in section 12 fails to identify sufficiently the *persons* who may receive the exemption and the *harms* that it is intended to alleviate. It therefore violates the nondelegation doctrine and is unconstitutional and void.

### III

In conclusion, I believe that the granting of an untrammeled power to the Attorney General to exempt certain persons from criminal liability violates equal protection and the nondelegation doctrine. The vague "public interest" standard for granting the exemptions creates too great a danger of arbitrary classification to uphold, especially when the personal liberty of the defendant may be at stake in a criminal proceeding. I would declare section 12 unconstitutional; and because it is an integral component of the criminal sanctions imposed under the Act, I would declare void all criminal sanctions that are subject to the exemption.

In the present case I would affirm the appellate court's conclusion that the convictions based on counts I, II and IV are void. For the reasons stated in Justice Moran's separate opinion, I would also affirm the appellate court's judgment which reversed the conviction based on count III.